## THE EXE.

### WILLIAMS v. THE EXE.

(Circuit Court of Appeals, Second Circuit. August 1, 1893.)

SHIPPING—DANGERS OF NAVIGATION.
Where a stanchion sufficient to resist the pressure of much heavier cargoes on previous voyages gave way from the pressure of a comparatively light cargo on a voyage during which dangers of navigation were encountered, which dangers had been excepted in the bill of lading, the inference is not of a defect in the stanchion, but of injury from the excepted dangers.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel by Williams against the steamship Exe for damage to cargo. The district court rendered a decree for libelant. 52 Fed. Rep. 155. Respondent appeals. Reversed.

J. Parker Kirlin, for appellant.

Sidney Chubb, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is a suit to recover damages against the steamship because of the nondelivery in proper condition of certain teas, shipped on the steamship at the port of Hiogo, Japan, for transportation to the port of New York, under a bill of lading of which the libelant became the assignee. The bill of lading contained a clause exempting the steamship from liability "for all and every the dangers and accidents of the seas and navigation, of whatever nature or kind." The teas were injured by sea water, which during the voyage entered the hold where they were stored; and the answer asserts that the failure to deliver them in proper order was caused by the dangers and accidents of the seas and navigation. The district court decreed in favor of the libelant. The decision proceeded upon the ground that the damage was caused, not by dangers of navigation, but because of the insufficiency of the interior structure of the vessel to protect the cargo from water damage.

The facts disclosed by the record are these: The teas were stored in one of the holds of the steamship, which was located above the ballast tank, and which was supposed to be a water-tight compartment. The water which injured them entered the hold from the ballast tank, through a hole caused by the giving way of a bolt. Extending from the floor to the roof of the hold was an iron stanchion, $1\frac{1}{2}$ or 2 inches in diameter. It was used as one of the supports for shifting-boards when grain was carried, to prevent the cargo from shifting. It rested at the roof and at the floor of the hold in an iron socket. The socket at the floor was formed with two lugs, through each of which a screw bolt passed through the iron floor of the hold into the iron roof of the ballast tank, thus securing the socket to the floor. When the cargo was unloaded at New York, it was found that this stanchion had an abrupt bend at a short distance above the socket. One of the lugs of the socket was broken off. One of the bolts was broken in two, and the other bolt was so loose as to play up and down through the floor of the hold and the roof of the ballast tank. Part of the broken bolt remained firm in its bearings, but the other bolt had become worn to such an extent as to allow the water to pass around it from the ballast tank to the hold. The tea boxes near the stanchion were somewhat battered, and one, which was in contact with it, was considerably broken. There had been no shifting of the cargo.

There is no direct evidence about the condition of the stanchion fastenings at the beginning of the voyage, as no special examination of them seems to have been made. It is shown, however, that at that time the stanchion was not bent. The steamship was a first-class all steel vessel, only four years old. There had been no leak on previous voyages, and the floor of the hold was dry when the teas were put in, and subsequently, when other cargo for the voyage was put in. The voyage occupied nearly three months, and on several occasions severe weather was encountered. Extracts from the log read as follows:

"August 22d. Steamer rolling very heavily, and at times making heavy plunges. August 23d. Very high, confused sea. Steamer rolling very heavily." "September 3d. Steamer pitching heavily at times." "September 5th. Steamer plunging heavily. Shipping water on deck over all." "September 23d. Steamer rolling heavily. Shipping water on deck fore and aft."

Similar entries appear in the log from time to time until as late a date as October 28th. From the description of the appearance of the cargo in the hold, and the rust upon the fracture of the broken bolt, it is inferable that the mishap occurred during the earlier part of the voyage.

Upon this evidence, we think the libel should have been dismissed by the district court, and the steamship exonerated. Undoubtedly, in every contract for the carriage of goods there is an implied engagement on the part of the carrier to furnish safe and suitable means of transportation, and, in the case of a carrier by ship, to supply a ship which is not only seaworthy, but is also reasonably fit to carry the cargo stipulated for in the bill of lading. It is also elementary law that a carrier by vessel cannot escape liability for the loss or injury of goods during transportation through dangers of navigation caused by his own previous default, notwithstanding an exception in the bill of lading from liability for sea perils. So, if the damage to the cargo in the present case, though immediately caused by a danger of navigation, would not have been incurred if the steamship had been in a reasonably fit condition to resist the escape of water from the ballast tank into the hold, the libelant should recover, notwithstanding the exempting clause. Our dissent from the conclusion of the court below proceeds upon a different view of the effect of the evidence to that taken by the learned district judge. In his opinion, after stating, in substance, that the pressure of the comparatively light cargo against the stanchion during the motion of the ship would not have been sufficient to bend the stanchion, the learned judge said:

"In my judgment, the damage proceeded from either the original insufficient strength of the stanchion, or from its bad condition or bad fastenings at the commencement of the voyage."

Inasmuch as the stanchion had been sufficient to resist the pressure of much heavier cargo on previous voyages, and as no evidence tending to show any original fault in the structure was given, the suggestion that it might have been originally of faulty construction must be rejected. Indeed, it is not contended by the counsel

for the libelant that there was any original defect in the stanchion, either of principle or in detail of construction, but the contention is that the bolt which became loose was old and worn, and gave way when the stanchion was not subjected to any unusual strain. If the bolt was thus insufficient, there was a breach of the implied warranty of the carrier, and the loss is to be attributed to that cause, and not to a danger of navigation. Whether it was or was not is the real question of fact in the case.

The fact that this stanchion, an iron rod, $1\frac{1}{2}$ or 2 inches in diameter, located where it was not exposed to the impact of any heavier object than a lot of chests of tea, and in apparent good order at the beginning of the voyage, was found at the end of the voyage bent in the manner described, is most persuasive. It could not have been thus bent except by some unusual and extraordinary strain or wrench. Unless the strain or wrench was caused by some sudden or violent straining of the vessel on some of the occasions when she was plunging and rolling heavily, or by the pressure of the cargo which yielded and surged with the surging of the ship, or by a combination of these conditions, the cause of it cannot be explained or even conjectured. The force that could so bend the stanchion would be sufficient to break the lug, and it is altogether probable that the same strain which bent the stanchion broke the lug and the bolt passing through that lug. If the broken bolt was the first to give way, it is not strange that the increased tension upon the other during the subsequent rough weather of the voyage should have started it, and worn away the screw threads. The giving way of a defective bolt would not account for the bend in the stanchion. We regard it as altogether more probable that the bolt gave way, not because it was loose and worn, and unable to meet the strain to which it was ordinarily exposed, but because it encountered an extraordinary strain. We conclude, therefore, that the primary cause of the loss was the excepted cause,—the violent seas, which set in motion the train of events that resulted in the entrance of the water into the hold and the injury of the cargo. We find nothing in the proofs to justify the contention for the libelant that those in charge of the steamship were negligent in not seasonably discovering the water, and removing it from the hold.

The decree is reversed, and the cause remanded, with instructions to dismiss the libel, with costs of the appeal and of the district court.