## THE TJOMO.

### (District Court, S. D. Alabama. April 12, 1902.)

1. SHIPPING—LOSS OF CARGO—IMPLIED WARRANTY OF FITNESS OF SHIP.

   The warranty that a ship is fit at the beginning of a voyage to safely carry the cargo received by her, which is implied where the bill of lading is silent, cannot be implied if the parties have contracted otherwise; and in such case the burden of proof is not upon the carrier, but upon the shipper, who must show the carrier's negligence to entitle him to recover for loss or damage to cargo.

2. SAME—STIPULATIONS IN BILL OF LADING.

   Stipulations in a bill of lading for cattle to be carried by ship, exempting the carrier from liability for accident to the cattle, or any mortality, "from whatever cause arising," and that the shippers accepted the fittings and fastenings as satisfactory, do not relieve the carrier, under the provisions of the Harter act, from the duty of exercising due diligence to properly equip and outfit the vessel, and to make her seaworthy, and capable of performing her intended voyage, nor lessen or avoid the

obligation to properly stow the cattle; but the burden rests upon the shipper to affirmatively prove negligence in such respects to charge the carrier with liability for cattle which were killed or washed overboard during a storm of such violence that it might well have caused the loss if the vessel were seaworthy, and properly fitted and loaded.

**8. SAME—CARRIAGE OF LIVE STOCK—LIABILITY FOR LOSS.**

A steamship had been in the cattle-carrying business for several months, during which time she had made 14 or 15 trips between gulf ports and Havana, on many of which she had carried cattle for libelant. On the voyage in question the ship encountered a storm of great violence, described by some of the officers of experience as the worst they had ever seen, during which the deck fittings were broken, and some of the cattle were lost. Libelant claimed that the fittings were not sufficiently strong, and that the cattle were overcrowded, but his testimony showed that he was familiar with the fittings, and had accepted bills of lading stipulating that they were satisfactory; that he was on the ship when she was being loaded, and made no complaint as to the manner of loading to the person having charge of the same, but after leaving the vessel sent another car load on board. The evidence also showed that the fittings were such as were customarily used for the purpose at that port, and were the same used on the previous voyages, which were made with safety, and also that the loading was the same as on former voyages. *Held*, that the evidence did not establish the unseaworthiness of the ship, or negligence in the stowage of the cattle, and that the loss must be attributed to excepted perils of the sea.

In Admiralty. Suit in rem to recover damages for loss of cattle in shipment.

McIntosh & Rich, for libelant.

Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge. The libelant brings this suit to recover damages for breach of contract on the part of the vessel to deliver a cargo of cattle shipped by him to Havana, Cuba. The ship sailed August 11, 1901, and while on her voyage, on the night of the 12th–13th of August, encountered a terrific storm in the Gulf of Mexico, in which many of the cattle were lost by being carried overboard or killed or injured by the breaking down of the superstructure of the cattle fittings upon the deck, which was in great part broken away and also carried overboard. The bill of lading contains the following provisions:

"It is expressly stipulated that live stock shall be at the risk of the owner, shipper, or consignee thereof, and the steamship is in no way responsible for any accident or any mortality which may occur during the voyage, * * * from whatever cause arising. It is also mutually agreed that steamer reserves the right to load the live stock either under or on deck of steamer, shippers accepting fittings, fastenings, and ventilation as satisfactory. It is also mutually agreed that this shipment is subject to all the terms and provisions of, and all exemptions from liability contained in, an act of congress of the United States approved on the 13th day of February 1893 [known as the "Harter Act"]."

"In every contract for the carriage of goods there is an implied engagement on the part of the carrier to furnish safe and suitable means of transportation, and in the case of a carrier by ship to supply a ship which is not only seaworthy, but is also reasonably fit to carry the cargo stipulated for in the bill of lading. It is also elementary law that a carrier by vessel cannot escape liability for the loss or injury

of goods during transportation through dangers of navigation caused by its own previous default, notwithstanding an exception in the bill of lading from liability from sea perils." The Exe, 6 C. C. A. 410, 57 Fed. 399.

In The Prussia, 35 C. C. A. 625, 93 Fed. 837, the court said:

"It is the duty of the carrier by water, when he offers a vessel for freight, to see that she is in suitable condition to transport her cargo in safety; and he impliedly warrants that this duty has been fulfilled. * * * But it is competent for the parties by express contract to modify the obligations which would otherwise devolve upon the carrier, including even that of providing a seaworthy vessel, and short of any modifications which will exempt him from the consequences of his own misconduct or negligence, or those for whom he is responsible, such contracts, though strictly construed against the carrier, are given full effect."

In Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 441, 9 Sup. Ct. 472, 32 L. Ed. 788, it is said that:

"Special contracts between the carrier and the customer, the terms of which are reasonable, and not contrary to public policy, are upheld; such as those exempting the carrier from responsibility for losses happening from accident, * * * or for perishable articles, or live animals when injured without default or negligence of the carrier."

The warranty that a ship is fit at the beginning of a voyage to safely carry the cargo received by her, which is decided to be implied where the bill of lading is silent, cannot be implied if the parties have chosen to contract otherwise. The burden of proof in such case is not upon the carrier, but upon the shipper, and there must be sufficient evidence of the carrier's negligence before the shipper can recover. The Southwark (D. C.) 104 Fed. 103.

The proctors for libelant do not, as I understand it, question these principles of law, but their contention is that, through the negligence of the owner of the steamship, or of those for whom he is responsible, the ship was unseaworthy, and improperly equipped, in that the fittings of the pens or compartments provided for the cattle were insufficient and insecure, both in construction and material; and that the cattle were improperly and negligently stowed on the ship by being too much crowded in the pens, and that the loss complained of was attributable to these causes. The claimant takes issue on this contention, and alleges that the loss was attributable solely to the perils of the sea. The evidence on the part of the claimant shows the encountering by the ship of a terrific storm of wind and heavy seas, characterized by the master of the ship as "a very heavy hurricane," with wind from 90 to 100 miles an hour. The first mate, who had been going to sea 10½ years, speaks of it as "the most terrible storm" he ever saw. The second mate has been going to sea 10 years, and says he "never saw such a big storm before." This evidence shows a specific and adequate cause for the loss of the cattle, consistent with the seaworthiness of the ship, and warrants the conclusion that this was the immediate cause of the loss. This, then, puts the burden on libelant to show that the result would have been prevented by the exercise of due care and diligence in the construction of the fittings of the vessel and in the proper stowage of the cattle. My opinion is that, notwithstanding the stipulations in the bill of lading, the owner of the ship

should have exercised due diligence to properly equip and outfit the vessel, and to make her seaworthy, and capable of performing her intended voyage, and the obligations of the master, agents, or servants to properly stow the cattle were not thereby lessened or avoided. Harter Act, Feb. 13, 1893. The Manitoba (D. C.) 104 Fed. 145. Where it satisfactorily appears that the vessel encountered marine perils which might well disable a staunch and well-manned ship, where it appears that the loss has been caused by the dangers of navigation, it devolves upon the shipper to make out that the damage might have been avoided by the exercise of reasonable care and skill upon the part of the carrier. Christie v. The Craigton (D. C.) 41 Fed. 62; The Warren Adams, 20 C. C. A. 486, 74 Fed. 413. If the steamship Tjomo was not unseaworthy at the commencement of the voyage either by reason of insufficient and defective fittings and fastenings or of negligent or improper stowage of the ship, then the libelant cannot recover. "The requirement of 'seaworthiness' intends that the ship shall be in a fit state as to repair, equipment, crew, and in all other respects, to encounter the ordinary perils of the contemplated voyage. Seaworthiness does not require perfection, but only reasonable fitness." The Aggi (D. C.) 93 Fed. 490; The Rover (D. C.) 33 Fed. 515; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; Dupont De Nemours v. Vance, 19 How. 162, 15 L. Ed. 584. "If the ship was at the commencement of the voyage in such a state as to be reasonably capable of performing it, she was seaworthy." The Titania (D. C.) 19 Fed. 101. "The question of seaworthiness is to be determined with reference to the customs and usages of the port from which the vessel sails, the existing state of knowledge and experience, and the judgment of prudent and competent persons versed in such matters." Id.

The preponderance of evidence clearly shows the seaworthiness of this vessel in respect to her fittings and fastenings. It shows that they were in accordance with the custom and usage of this port with vessels engaged in the same trade prior to the storm in which the loss here complained of occurred; that this particular vessel had been regularly running in the trade for four or five months prior to that time; that her fittings were substantially like those of the other vessels in the same line; that libelant had been a regular shipper of cattle with the line of steamships to which the Tjomo belonged for about two and a half years, and had shipped on the Tjomo nearly ever since she had been in the trade, and that he was familiar with her fittings for cattle. The libelant described the character of the fittings, and stated that some of the planks out of which they were constructed were split at the ends, and that the nails would not catch well, and that some part of the structures was weak. He, however, stated that his observation of this condition of things was several weeks—perhaps one or two months—before the trip on which the loss complained of occurred. There was some other evidence on the part of libelant as to the character and condition of the fittings of this steamship, but it related to them subsequent to the storm. There was also expert testimony for both libelant and claimant on the question of the sufficiency of fittings of the character of those shown to have been constructed on the

Tjomo, the preponderance of which was that they were fit and sufficient for the ordinary dangers of navigation in the voyages in which she was engaged. The fact that this ship had been for several months subjected to conditions calculated to test her seaworthiness in respect to her fittings without any evidences of defect in them, and thereafter an adequate cause for their destruction was present, is sufficient evidence that the ship was seaworthy at the beginning of the voyage. The Aggi, supra, and authorities therein cited. It appears that she had made 14 or 15 trips in this trade, and had met with no accident or mishap. And the fact that libelant, who had made frequent shipments of cattle by this steamship, and was at every shipment on or about the ship when she was being loaded, and was familiar with her fittings and fastenings, accepted bills of lading with a stipulation therein that the fittings and fastenings were satisfactory, I think clearly demonstrates that such fittings and fastenings were proper and sufficient to encounter the ordinary perils of the sea. But it is said that libelant did not receive the bills of lading until after the ship had sailed. It was his right to have had them before the ship sailed, and he could have demanded them if desired. Moreover, he had been a frequent shipper of cattle on this vessel, and it may reasonably be presumed that the previous bills of lading accepted by him contained a like stipulation as to the fittings, etc. My opinion is that libelant has not only failed to show negligence on the part of the ship in providing fit and sufficient fittings and fastenings for the cargo, but that the evidence shows she was entirely seaworthy in this respect.

Was there a want of proper skill and care in stowing the cattle? "It is well settled that in determining what is proper stowage the customs and usages of the place of shipment are to be considered, and, if these customs are followed, and if none of the known and usual precautions for safe stowage are omitted, no breach of duty or negligence can be imputed to the ship, and in case of damage under great stress of weather the injuries will be ascribed to perils of the seas." The Titania (D. C.) 19 Fed. 107. Libelant testified that he saw all of his cattle after they had been put aboard the ship, except one car load of 24, which had not been loaded at the time he was aboard; that they were loaded later. He said his cattle were too crowded, and that he told the first mate of the ship, who was present, that they were crowded, but that the first mate was not superintending or supervising the loading of the cattle; that a stevedore was, and that he made no complaint to the stevedore, or to the master of the ship; that he does not know how many cattle he had aboard without seeing the bill of lading. He further testified that there were 85 grown cows in two pens,—43 and 42,—and he thought there were 60 or 65 calves divided in the two pens, and that there were from 70 to 80 cows and calves in each of the pens. It does not appear that he counted the cattle. He says he had shipped a great many cattle by this ship and others in the same line, and that the usual load was from 18 to 25 in a pen. W. J. Denton testified on behalf of libelant that he is now in the cattle business with libelant; that he observed the loading of the steamship Tjomo in last August, when libelant's cattle were shipped; that he told libelant his cattle were crowded too many in a pen; did not know how many;

was not then with libelant. He further says that the usual number put in a pen is 20 or 25, and he has known as many as 30, where they were not very large. Frank A. Ross testified on behalf of claimant that he, as stevedore, loaded the steamship Tjomo on the trip in question; that he does not recollect exactly how many cattle were put in a pen at that time; the ship had a full cargo, but was not overloaded, and the cattle were not overcrowded; that it was usual to put from 20 to 30 in a pen,—not more; the superstructure where these cattle were stowed was divided into four pens, and the cattle were loaded as was customary. But Scott testified for claimant that he was foreman of cattle fittings, and was so employed in August last on the steamship Tjomo; that she usually put about 25 head of cattle in a pen; that she could carry as many as 30 if packed, and, if there were small calves among them, could carry 35; that he did not think there were as many as 40 on the trip referred to; that the ship had no greater load on her than he had seen on her at other times, or on other vessels of the line. He did not count the cattle, and did not know how many were in the pens. From observation he did not think there were more than was customary. The master of the steamship testified that the manner of loading and stowing the cattle on the voyage in question was not different from the customary manner in the former shipments by libelant; that the largest number of cattle they put in a pen is about 35; cannot say definitely how many were put in a pen on this voyage; paid no particular attention to how many were in a pen so long as he did not see too many. In this state of the evidence it is difficult to determine whether the cattle were or were not stowed in a proper mode,—whether or not there were too many in a pen; but there is one circumstance shown in this connection which I consider of much weight, and that is the fact that libelant saw his cattle were badly crowded, as he says, and yet subsequently had put aboard and shipped 24 additional head of cattle. The burden being on the libelant to show negligence in the stowing of the ship, he has failed to satisfy me by the evidence that the ship was not, as regards the stowing, reasonably fit to encounter the ordinary perils that might be expected on her voyage; and, even if she was not reasonably fit to encounter such ordinary perils, the evidence fails to satisfy me that the loss was occasioned by that unfitness.

My judgment is that the libelant is not entitled to recover, and that the libel must be dismissed.