## THE OCEANA.

(District Court, E. D. New York. June 29, 1909.)

1. SHIPPING (§ 132*)—CARRIAGE OF GOODS—ACTION FOR DAMAGE TO CARGO—BURDEN OF PROOF.

A vessel which was new, properly constructed, and in all respects seaworthy cannot be held liable for leakage under bills of lading exempting her from loss on that account and from weather, heat, and perils of the sea, unless it is affirmatively shown that there was negligence in the stowage which it should reasonably have been anticipated would cause such damage, and the libelant must make out a case showing the cause of injury with sufficient clearness before the burden is cast upon the vessel to show that the exemption is broad enough to cover the damage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 479–482; Dec. Dig. § 132.*]

2. SHIPPING (§ 132*)—CARRIAGE OF GOODS—ACTION FOR DAMAGE TO CARGO—SUFFICIENCY OF PROOF.

A new steel steamer carried for libelant a consignment of cocoanut oil in casks from Colombo, Ceylon, to New York in the winter, under bills of lading exempting her from liability for loss or damage caused by heat, leakage, or perils of the sea. A part of the consignment was stowed in the lower hold and a part on the bridge deck, and in the latter part there was an excessive leakage, but the cause of it was not definitely shown. *Held* that, under the evidence, there was not sufficient proof that the bridge deck, which appeared to be well ventilated, was an improper place for such cargo, to charge the master with negligence, or render the vessel liable for the loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit for loss of cargo from leakage.

Hunt, Hill & Betts (George W. Betts, Jr., of counsel), for libelants.

Convers & Kirlin (John M. Woolsey, of counsel), for claimant.

CHATFIELD, District Judge. In the year 1907 the Oceana, a new iron steamship, started from Glasgow, Scotland, and, after a voyage through the Suez Canal to Hong Kong, returned to Calcutta, and thence proceeded to Colombo, Ceylon, with certain cargo in what was called the "bridge deck space" and "hold No. 3." This cargo was discharged at Colombo, and the spaces indicated filled with other goods for a voyage to Boston and New York. The port of Colombo was left upon the 31st day of December, 1906, and the vessel proceeded through the Indian Ocean and the Red Sea, to the Suez Canal, which was entered upon the 16th day of January, 1907. Two days were occupied in passing through the canal, and the vessel finally reached Boston on the 14th day of February, 1907, thence proceeding to New York, and arriving there on the 23d day of February, 1907, where the cargo was discharged.

Among the cargo taken on at Colombo were four lots of cocoanut oil in pipes, puncheons, and hogsheads; a puncheon being larger than a hogshead, and a pipe larger than a puncheon. The weight of a pipe full of oil is something over a ton, a pipe being a straight staved barrel, some 5 feet long, with a uniform diameter of 3½ feet. There is considerable testimony to the effect that the large and heavy pipes are difficult to handle, and subject to great strains, also that under excessive heat the wood of the pipes shrinks, the hoops expand, and the heads of the pipes thus become loose enough so that there is leakage around the heads. Cocoanut oil congeals at a temperature of 62 degrees Fahrenheit, becoming more fluid as the temperature rises, and the testimony shows that a reasonably well-ventilated and cool place should be used for stowing cargo of this character in order to avoid excessive leakage. The four lots of cocoanut oil taken on at Colombo were marked by a keystone device, with the numbers 90, 91, 92, and 93. Lots 90 and 91 were stowed in the hold, and all the lots were stowed in a single tier of pipes, with casks of plumbago properly chocked and dunnaged in a second tier. No fault has been shown in any way with the manner or method of loading, and the dunnage seems to have kept in place and served its purpose throughout the entire trip. The same is true as to lots 92 and 93, which were carried in what is known as the bridge deck space, with the exception of a few packages of lot 93 in one of the holds. While the testimony of one of the experts was to the effect that the cargo showed some working or slight shifting, indicating that it had been subject to the movement of the vessel in severe weather, it was generally in good order upon arrival. The only point as to which discussion could arise, and upon which the present action has been based, is with reference to the leakage of the cocoanut oil in the four lots referred to, which were the property of the libelant, and as to which there was a considerable shortage in the quantity of the cocoanut oil when the delivery was made at New York. As has been said, the testimony shows that the packages were in good condition at Colombo, and again ap-

peared to be in good condition at New York, and the temperature of the air and the water in the North Atlantic, up to the time of unloading the vessel, was such that the cocoanut oil was then entirely congealed. The leakage in the bridge deck space was shoveled up, some 32 barrels of drainage, a portion of which, 25 barrels, was awarded to the libelants as their share of the loss by leakage. This award was refused, claim was made for the amount of oil involved, and a libel filed, in which the libelants allege that they lost from the four lots of oil in question some 18,697 pounds, valued at $1,916.44.

The libelants allege that there was negligence in the loading, storing, and caring for this oil by the steamship, failure to properly deliver, to make the vessel seaworthy, and in furnishing a proper place of stowage for the oil. The bill of lading contained the following exceptions, and is sufficient to cover all of the allegations of the libel, except that in which it is alleged that the officers and agents of the vessel caused this oil to be carried in an improper place:

"(2) Carriers are not liable for * * * heat, or any accidents, loss or damage arising from * * * any other peril incident to steam navigation, or perils of the sea," etc.

"(4) Drainage and leakage, breakage, loss or damage by * * * rain * * * frost * * * heating * * * or any loss or damage arising from the nature of the goods," etc.

Each bill of lading has, in addition to these printed exceptions, a stamp, "Not responsible for leakage, unless caused by improper stowage."

Testimony has been offered to show that the particular part of the vessel where these lots were stowed was not a proper place because of the intense heat to which the oil was subjected upon this particular voyage. Some testimony was offered as to the loss of oil in hold No. 3, which is at the bottom of the vessel, but immediately aft of the engine room. The testimony shows that the oil in that hold was properly stowed and dunnaged, was separated from the partition or bulkhead of the engine room by a space of some 30 feet, and no negligence of any sort has been shown with respect to the cargo in that part of the vessel. One witness testified that a greater amount of partly empty packages existed in that hold than in the bridge deck space, and the officers of the vessel testified that a large quantity of oil was pumped out by the engines from the bilges of the vessel, into which leakage would run from the lower hold.

The Oceana is what is known as a three-island ship, built of steel, and the boiler room and engine space extend upward in a shaft or trunkway, terminating in a skylight, through which the smokestack projects. A cargo space, called the "bridge deck space," surrounds this trunkway or space upon four sides. The upper part of the boilers, engine, and smokestack extend through the trunkway, to the level of the bridge deck space. The boilers and engine were protected by asbestos, and a large hatchway in the bridge deck, together with four ventilator or grating hatches and two doors at each end of the bridge deck space, give considerable and probably sufficient ventilation to this space when the hatches and doors can

be left open for that purpose. The testimony shows that the only rough weather encountered by the Oceana, which is a large vessel, some 370 feet in length, was in the Mediterranean and the North Atlantic. The temperatures there, both atmospheric and of the sea water, and also in the engine room and bunkers, was not excessive; the atmospheric temperature, in fact, being such that the cocoanut oil would be congealed for a greater part of the time, and no leakage would seem to have been possible on that part of the voyage, except from the working of the cargo under the effect of the rough weather before the oil became congealed. Such leakage was covered by the bill of lading. The voyage occurred at a season when the northeast monsoon was blowing, and the temperatures in the Indian Ocean and the Red Sea were lower than at other portions of the year. While in the Red Sea, for about four days, from January 9th to 12th, the wind blew from the southeast, constituting a following wind, which the witnesses all agree would produce the most extreme conditions of heat upon the decks and inside of the vessel, where the temperature was dependent upon the breeze. Some of the hatches were uncovered, and the cargo space ventilated regularly, and through the Indian Ocean and the Red Sea the hatches in the bridge deck were used for ventilating purposes to a greater or less extent. The rear doors of the bridge deck space were left open during the entire voyage. Those in front were closed. But the witnesses who are familiar with iron steamers of this class practically agree that the ventilation afforded was as extensive and successful as could have been secured by hoods or funnels, and that the bridge deck space in question was not defective in any way that could have been remedied by her officers, or in any way which would affect the safe carrying of a cargo which could properly be put in such a place for transportation. The testimony shows that cocoanut oil has to be separated from any part of the cargo that will be affected by its odor; and, in view of the exemption covering loss from weather, leakage, heat, etc., no liability can be imposed upon the vessel for the acts of its officers merely because the leakage occurred, whether due to heat or otherwise, unless it can be affirmatively shown that there was negligence on the part of the claimant in respect to some improper method of stowage which should reasonably have been anticipated would cause the damage which the testimony shows did result. The Claverburn (D. C.) 147 Fed. 850; The Fanny Skolfield (D. C.) 65 Fed. 814.

Under these circumstances, it is evident that the libelants have made out no case with respect to any of the cargo in the lower hold, nor with respect to any of the cargo carried in the bridge deck space, unless the testimony shows that it was negligence for the officers of the vessel to put the cargo in that space for the voyage from Colombo to New York. The temperature of the engine room and of the coal bunkers was high throughout the entire period that the Oceana was on the way from Colombo to the Suez Canal. The temperature in the engine room reached the point of 133 degrees, which was admitted by all of the witnesses to be an excessive heat, in the Indian Ocean. But, as has been said, the temperature

of the air and the condition of the winds were then favorable to ordinary temperatures upon the vessel; and when the following wind and warm atmosphere, with a clear sky, in the Red Sea, would naturally be expected to have occasioned a further rise in the temperature of the engine room, the testimony shows that the engine room and bunkers were at a lower temperature than had previously existed under more favorable conditions. Under these circumstances, it is impossible to hold that the captain should have anticipated excessive temperatures from which loss or leakage would result merely from the weather and sun alone. On the other hand, as has previously been said, the testimony of the claimant's witnesses does not satisfactorily explain the leakage as the result of any working of the cargo when severe weather was encountered, inasmuch as low temperature then existed such that the oil would be solidified, or nearly so. The dispute as to whether more leakage resulted in the bridge deck space than in the lower hold seems to be conclusively determined by the testimony of the weighers who discharged the cargo and found a great shortage in lots Nos. 92 and 93, and a smaller shortage in lots Nos. 90 and 91, from the lower hold. But lot No. 93 suffered much less than No. 92, and yet both were in the bridge deck space. Again, the working of the vessel under the effect of weather would have a much greater tendency to cause leakage in the upper portions of the vessel, but no responsibility therefor under the bill of lading could be imposed upon the vessel if leakage resulted from that cause, for that would be an ordinary peril of the sea. The libelants' witness Clarke testified to the effect that:

If "one cask loosened owing to the head starting, or from any other cause, the probability would be that the working of the ship would cause all the remaining casks to work, and this at so high an elevation in the ship would be more likely in consequence of the motion being heavier."

Mr. Clarke's opinion from observation of shipments of cocoanut oil under such conditions is that the oil becomes very thin, and that the reflected heat from the iron plating of the ship causes the casks to shrink and the oil to flow more readily.

Under such conditions, and upon all the testimony in the case, it would seem that the leakage must have occurred through the working of the packages when subjected to heat of more than ordinary degree. But the libelants have given no satisfactory testimony to explain why this resulted upon this particular voyage, or in this particular part of the ship, other than that damage did occur. It does not seem that this, in view of the exceptions in the bill of lading, can of itself prove negligence. Ordinary working of the cargo in any part of the vessel is a "peril of the sea" if the character of the cargo is not such that some greater care than ordinary good stowage is plainly required. The same rule would apply to leakage and heating when the cargo is not stowed in a place known to be improper, or in which bad results should reasonably have been anticipated. The libelants must make out a case showing the cause of the injury with sufficient clearness before the burden of proof can be thrown upon the claimant to show that the exception is broad enough to cover the damage, if it in terms

is applicable to the damage proved. This seems to be the doctrine of The Patria, 132 Fed. 971, 68 C. C. A. 397, and The Folmina, 153 Fed. 364, 82 C. C. A. 440. The testimony in the present case does not satisfy the court that the bridge deck space was of such construction or arrangement that the responsible parties should have anticipated the extraordinary damage shown. The conditions on the Oceana upon this her first voyage do not seem to have indicated that such excessive temperatures would ordinarily result, and the cargo space in question was apparently well ventilated. That excessive temperatures existed in this cargo space is only inferentially demonstrated, and such temperatures existed, if they existed at all, at intervals when the temperature would reasonably from the reports of the log have been lower than at other times.

Further testimony of a number of witnesses offered on the part of the defense as to the carrying of cargoes of cocoanut oil upon vessels similarly constructed in tropical regions, and of the customary methods of loading at Colombo, furnish no evidence of any facts of which the officers of the Oceana should have had knowledge, or which they should have considered in assuming that the bridge deck space of the Oceana could not be used for this purpose. The libelants offered without objection the testimony of several witnesses as to whether the space used for the carrying of cocoanut oil on this voyage was a proper space. It is considered that this is the question before the court, and the testimony of these men, in so far as they were offered as experts, was of value only in pointing out what in their opinion would be the effect of certain conditions and methods of construction in an iron vessel with respect to the carrying of such a cargo. The claimant offered in evidence the testimony of a number of witnesses, as has been said, as to the customary methods of loading, and cites a number of cases, including The Dan (D. C.) 40 Fed. 691, The Keystone (D. C.) 31 Fed. 412, The City of Alexandria (D. C.) 23 Fed. 826, and The Tjomo (D. C.) 115 Fed. 919, where customary methods of stowage or loading were proven in determining whether the duty of properly stowing a cargo had been fulfilled. But it was held upon the trial, and now seems to the court, that such testimony is not conclusive upon the precise question as to whether it was negligence to use the bridge deck space of the Oceana for cocoanut oil upon the voyage in question.

It may be assumed that the captain of the Oceana was entitled to rely upon his knowledge of what was customary in determining what would be expected of him as the result of his experience, and that of others, in properly stowing a cargo, and that testimony as to custom furnishes some evidence as to what experience has shown with respect to certain conditions. But evidence as to custom will not by itself answer the charge that the captain of the Oceana should have reasonably anticipated that the bridge deck space of his vessel would be too hot a place for the safe stowage of barrels containing cocoanut oil. If experience continued to show that the bridge deck space of the Oceana could not be kept properly ventilated, and produced a degree of heat so great as to affect packages of cocoanut oil in the manner indicated, it would certainly be negligence for the captain to use the bridge deck space for that purpose. But the libelants have not satisfactorily met the

burden of proof resting upon them to show that upon this first voyage, at a favorable time of the year, on a vessel constructed similar to other vessels in which weather alone had not caused similar results, it was negligence to carry a cargo of cocoanut oil in the bridge deck space, when the bill of lading excepted the vessel from responsibility for heat, from the effects of any working of the cargo when properly stowed, and from leakage caused by any of those sources. It is apparent that some damage resulted, that this damage was substantially confined to the bridge deck space, and that the damage was in the nature of leakage; but it has not been clearly indicated whether this leakage came from the working of the packages or from the shrinkage of the staves, nor whether excessive heat (which should have been guarded against) affected these packages, rather than that they leaked under what would be ordinary heat in those localities.

The conclusion must be that the libelants have failed to sustain the burden of proof upon them, and the libel should be dismissed, even with respect to the cargo in the bridge deck space. As to the leakage in the hold, which was included in the libel, no negligence of any sort has been shown by the testimony, and as to this, therefore, there is not even necessity for discussion.

The entire libel must be dismissed.