## THE PRUSSIA.

(Circuit Court of Appeals, Second Circuit. April 4, 1899.)

No. 96.

1. SHIPPING—DAMAGE TO CARGO—CONTRACT LIMITING LIABILITY OF CARRIER.

A carrier by water, who accepts a cargo of frozen meat for transportation across the ocean, impliedly contracts that his vessel is provided with suitable and efficient apparatus to enable him to deliver the cargo in proper condition; but it is competent for the parties, by express contract, to stipulate for the exemption of the carrier from liability for loss or damage to the cargo in consequence of latent defects in such apparatus which are not due to any fault or negligence on his part, or on the part of those for whom he is responsible.

2. SAME—EFFECT OF HARTER ACT.

Such a stipulation in a bill of lading is not in violation of section 2 of the Harter act.

3. SAME—TRANSPORTATION OF FROZEN MEAT.

A steamship company contracted for the carriage of a consignment of fresh meat to a European port; the bill of lading containing a provision expressly exempting the carrier from liability for loss or damage arising from any defect or insufficiency in the refrigerating apparatus of the vessel. The meat became damaged on the voyage in consequence of the failure of the refrigerating machinery to work properly. The apparatus, as well as the vessel, was new, had been constructed by competent makers,

and had been thoroughly tested, and found to work perfectly. Its failure to work properly on this voyage was caused by the presence in a suction pipe of a leather washer, which had been inadvertently left in the interior of the apparatus when it was put together by the makers, and had gradually worked into the pipe. Its presence could not be detected until the machinery was taken apart by an expert at the end of the voyage. *Held*, that due diligence was exercised by the owner of the vessel to provide suitable and perfect refrigerating machinery, and that the damage arose from a latent defect, for which it was not responsible under the terms of the bill of lading.

Appeal from the District Court of the United States for the Eastern District of New York.

Lawrence Kneeland, for appellant.

Everett P. Wheeler, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from a decree (88 Fed. 531) dismissing a libel filed to recover damages caused by the deterioration of a quantity of dressed beef shipped by the Schwarzschild & Sulzberger Company at New York in July, 1894, on the steamship Prussia, to be transported to Hamburg, and which was insured against loss or damage by the libelant. The beef was shipped under a bill of lading which contained the clause as follows:

### "Dressed-Meat Clause.

"It is expressly agreed that the goods named herein are shipped and carried at the sole risk of the shippers or owners thereof, and that the shipowners shall in no case be responsible for any loss or damage thereof, or in any wise relating thereto, whether such loss or damage arise from defect or insufficiency, either before or after shipment, in the hull of the said steamer, or in her machinery, boilers, or refrigerating chambers machinery, or in any part of the refrigerating apparatus, or in any material, or the supply or use thereof, used in the process of refrigeration, and whether such loss or damage, however arising, be caused by the negligence, default, error in judgment, of the pilot, master, officers, engineers, mariners, refrigerating engineers, or other servants of the shipowners, or persons for whom they are responsible, or by negligence in stowage."

The Prussia was engaged in the business of a common carrier, running in a regular line between New York and Hamburg, and was equipped with cold-storage rooms, maintained for the purpose of carrying dressed meat, and with refrigerating apparatus designed to maintain a temperature in the compartments slightly below the freezing point, necessary to preserve the meat from injury. She was a new vessel, built at Belfast, and completed in May, 1894. The refrigerating apparatus was built at Dartford, England, and was what is known as a "duplex machine," consisting of two machines situated side by side, and driven by one engine. This apparatus was thoroughly tested by the makers before it was sent to the ship. After it was put into the vessel it was again tested, under the supervision of the makers, the shipbuilders, and an engineer in the employ of the owner, the Hamburg-American Packet Company; this test continuing from 11:30 a. m. May 29, 1894, to 3:40 p. m. May 30th. The proper temperature of the refrigerating rooms was maintained during this

test, and the apparatus proved thoroughly satisfactory. The next day the steamship sailed from Belfast to Hamburg. The refrigerating apparatus was kept running throughout that voyage, and worked satisfactorily, maintaining the proper temperature to cool the provision rooms; each machine being run on alternate days. From Hamburg the vessel proceeded on a voyage to New York, and the refrigerating apparatus was operated throughout this voyage, and worked satisfactorily. The steamship then proceeded on the voyage to Hamburg, during which the meat in controversy was injured. The meat had been placed in two refrigerating rooms. On July 16th, the second day out, it was found that the refrigerating apparatus was not working satisfactorily. The next day the starboard machine was stopped, and the meat in the upper refrigerating room was transferred to the lower room. In the meantime the temperature of the refrigerating rooms rose above the freezing point, thereby injuring the meat. Thereafter only one machine was used. After the meat was transferred to the lower room, the temperature of that room was gradually reduced to the proper point by the use of one machine.

It is conceded that the cause of the injury to the meat was the failure of the starboard machine to work, owing to the presence of a leather washer in the apparatus. This could not be detected until the apparatus was taken apart after the arrival of the vessel at Hamburg. It was then found in the suction pipe leading from the evaporator, by an engineer sent to Hamburg by the makers of the apparatus for the purpose of investigating the trouble. The proofs denote that the washer must have been left in the apparatus by the inadvertence of the employés of the maker when putting it together. By the operation of the apparatus during the voyages of the vessel, it gradually worked its way through the evaporation coils to the suction pipe, where the smaller diameter caused it to obstruct the efficient working of one of the machines.

We agree with the learned judge who decided the case in the court below that the libelant was not entitled to recover upon the theory that the owners of the Prussia were negligent in providing defective refrigerating apparatus for the purposes of the transportation. The apparatus had been constructed by builders of requisite capacity, and, after it had become a part of the equipment of the steamship, had been tested by competent experts in the most thorough manner, and found to be perfect. It was new, and had not been used long enough to impair its efficiency; but it had been used sufficiently to demonstrate that it was adequate, and apparently in perfect condition.

It is the duty of the carrier by water, when he offers a vessel for freight, to see that she is in suitable condition to transport her cargo in safety; and he impliedly warrants that this duty has been fulfilled. And, when he proposes to transport across the Atlantic a cargo of frozen meat, we agree, as was adjudged in The Maori King [1895] 2 Q. B. 550, and Queensland Nat. Bank v. Peninsula & Oriental Steam-Nav. Co. [1898] 1 Q. B. 567, that he must be taken to stipulate with the shipper that the vessel is provided with suitable apparatus of requisite efficiency to enable him to deliver it in proper order. But

it is competent for the parties, by express contract, to modify the obligations which would otherwise devolve upon the carrier, including even that of providing a seaworthy vessel; and short of any modification which will exempt him from the consequences of his own misconduct or negligence, or those for whom he is responsible, such contracts, though strictly construed against the carrier, are given full effect. Among them, one of the most common is that exempting carriers from liability for latent defects in the hull or machinery of the vessel. As was said by Mr. Justice Brown in The Carib Prince, 170 U. S. 664, 18 Sup. Ct. 757: "To exempt a vessel from the consequences of such a defect is neither unreasonable nor unjust, and most of the modern bills of lading contain a stipulation to that effect."

In the present case the bill of lading contained a clause especially addressed to restricting the liability of the carrier in respect to the transportation of dressed meat, and the parties to the instrument agreed that the carrier should not be responsible for any loss or damage to it arising from defects or insufficiencies in any part of the refrigerating apparatus, whether arising before or after the shipment. While this clause would not extend to exempt the carrier for loss or damage caused by his own negligence, we have no doubt it protects him against such as arises in consequence of a latent defect in the apparatus, existing without his knowledge or negligence. The express contract displaces the warranty which would be implied in its absence.

It is insisted for the appellant that the clause is in violation of section 2 of the Harter act. In our opinion, the provisions of this section only prohibit contracts relaxing the obligation of carriers to exercise due diligence in respect to providing seaworthy vessels, and in respect to the handling and storage of cargoes. The warranty of seaworthiness is that a vessel is competent to resist the ordinary action of the sea during the voyage, without damage or loss of cargo (Dupont De Nemours v. Vance, 19 How. 162),—in other words, in such a state, as to repair, equipment, and crew, as to be able to encounter the ordinary perils of the adventure (Gibson v. Small, 4 H. L. Cas. 390). The carrier is not an insurer against damage proceeding "from an intrinsic principle of decay, naturally inherent in the commodity itself, whether active in every situation, or only in the confinement and closeness of the ship" (Clark v. Barnwell, 12 How. 282); and the implied understanding created by the proposal to transport and deliver a commodity, which the shipper and carrier know cannot be practically performed unless the carrier is provided with the proper instrumentalities in customary use for its preservation, is not a warranty of seaworthiness. Section 2 of the Harter act is the complement of section 3, which excuses the shipowner if he has exercised due diligence to make the vessel "in all respects seaworthy, and properly manned, equipped and supplied." The two sections are to be read together, both being intended to enforce the same rule of diligence in respect to the same subject-matter.

We conclude that the damage sued for arose in consequence of a latent defect in the refrigerating machinery, that due diligence was exercised by the owner of the steamship to provide suitable and per-

fect refrigerating machinery, and that by the terms of the Harter act, as well as irrespective of that act, it is lawful for a vessel owner, who has exercised due diligence in that behalf, to stipulate for exemption from liability arising from such a defect. We desire to take this occasion to commend the course adopted, of bringing this suit in the name of the insurer. Heretofore nearly all the causes which we have had to consider, brought against vessels to recover damages to cargo, have been ostensibly prosecuted by the shipper, although really by the insurer; and too many of them have been brought upon the chance that something not known at the time might be developed in the course of the proofs to shift the loss from the insurer upon the vessel. The present case is not open to this criticism in either respect.

The decree is affirmed, with costs.