## THE SOUTHWARK.

(District Court, E. D. Pennsylvania. September 24, 1900.)

SHIPPING—INJURY OF CARGO FROM DEFECTIVE REFRIGERATOR—LIMITATION OF LIABILITY BY BILL OF LADING.

An agreement in a bill of lading for dressed meats to be transported across the Atlantic, that the carrier shall not be responsible for any loss or damage arising from breakdown or injury to the ship's refrigerator or its machinery, even though arising from defect existing at or previous to the commencement of the voyage, is one which it is competent for the parties to make, and it relieves the carrier from liability for loss resulting from such causes unless negligence is shown, and the burden as to that issue rests upon the shipper, as the express contract modifies and supersedes the implied warranty of the fitness of the vessel and her apparatus for the service undertaken which would otherwise arise.

In Admiralty. Suit to recover damages for injury to cargo.

Horace L. Cheyney and John F. Lewis, for libelants.
Biddle & Ward and J. Rodman Paul, for respondent.

McPHERSON, District Judge. On July 3, 1894, the libelants shipped a quantity of dressed meat by the steamship Southwark, to

be carried from Philadelphia to Liverpool. The vessel was fitted with a refrigerating compartment known as the "commercial box," and with refrigerating machinery of an approved pattern. The bill of lading contained the following clause:

"It is expressly agreed that the goods shipped hereunder are absolutely at the risk of the owners in every respect, and that the carrier is responsible for no loss, delay, or damage thereto, however arising, including stowage and all risks of breakdown or injury, however caused, either to its refrigerator or its machinery, even though arising from defect existing at or previous to the commencement of the voyage."

The refrigerating machinery had been in use for several years, and had always worked satisfactorily. Shortly before the voyage in question, it had been inspected by a competent official, and was apparently in good order. Within two or three hours after leaving port, however, a joint was found to be leaking, and it was necessary to stop the machinery in part so that the needful repair could be made. This was finished on July 5th, and the machinery was again started. On the same day a more serious breakdown occurred, and upon examination it was found that certain bolts and rods in the compression pump were broken or bent, and the piston was cracked. Later the crank shaft also was discovered to be bent, and not until July 8th was the machinery again in full operation. Its efficiency in reducing the temperature of the commercial box had, of course, been either suspended or impaired during the breakdown, and even after the repairs had been completed the temperature was not sufficiently lowered until the last day of the voyage. The injured parts were replaced in Liverpool, and since then the machinery has done its work well. Upon the arrival of the vessel in England, the libelants' meat was found to be injured by the unduly high temperature of the commercial box, the loss in market value being said to exceed $6,000.

The question presented by these facts is this: What effect should be given to the foregoing clause in the bill of lading? As it seems to me, the answer is furnished by the decision of the court of appeals of the Second circuit in The Prussia, 35 C. C. A. 625, 93 Fed. 837, as the following quotation will, I think, make clear:

"It is the duty of the carrier by water, when he offers a vessel for freight, to see that she is in suitable condition to transport her cargo in safety; and he impliedly warrants that this duty has been fulfilled. And when he proposes to transport across the Atlantic a cargo of frozen meat, we agree, as was adjudged in The Maori King [1895] 2 Q. B. Div. 550, and Queensland Nat. Bank v. Peninsular & Oriental Steam Nav. Co. [1898] 1 Q. B. Div. 567, that he must be taken to stipulate with the shipper that the vessel is provided with suitable apparatus of requisite efficiency to enable him to deliver it in proper order. But it is competent for the parties by express contract to modify the obligations which would otherwise devolve upon the carrier, including even that of providing a seaworthy vessel; and short of any modification which will exempt him from the consequences of his own misconduct or negligence, or those for whom he is responsible, such contracts, though strictly construed against the carrier, are given full effect. Among them, one of the most common is that of exempting carriers from liability for latent defects in the hull or machinery of the vessel. As was said by Mr. Justice Brown in The Carib Prince, 170 U. S. 664, 18 Sup. Ct. 757, 42 L. Ed. 1187: 'To exempt a vessel from the consequences of such a defect is neither unreasonable nor unjust, and most of the modern bills of lading contain a stipulation to that effect.'

"In the present case the bill of lading contained a clause especially ad-

dressed to restricting the liability of the carrier in respect to the transportation of dressed meat, and the parties to the instrument agreed that the carrier should not be responsible for any loss or damage to it arising from defects or insufficiencies in any part of the refrigerating apparatus, whether arising before or after the shipment. While this clause would not extend to exempt the carrier for loss or damage caused by his own negligence, we have no doubt it protects him against such as arises in consequence of a latent defect in the apparatus, existing without his knowledge or negligence. The express contract displaces the warranty which would be implied in its absence."

The clause then under consideration was essentially the same as the clause now before the court, and I think the decision must be the same now as then. I see no sufficient evidence of negligence on the part of the vessel, either in supplying unsuitable machinery, or in failing to inspect properly, or in improper management (whatever the scope of the word "management" may be), and without proof of negligence on the part of the ship the libelants' case must fail. It was argued that the machinery could not have been in good condition at the beginning of the voyage, because the breakdown occurred so soon after the vessel set sail; and therefore that, in analogy to the rule of evidence concerning seaworthiness, the burden of proof was on the respondent to explain the causes of the various accidents; but I do not think the conclusion follows where the carrier's liability has been modified by such an agreement as the clause in question. The warranty that a ship in this business is fit at the beginning of a voyage to carry dressed meat safely—which was decided to be implied where the bill of lading is silent (The Maori King [1895] 2 Q. B. Div. 550)— cannot be implied if the parties have chosen to contract otherwise; and such a contract is clearly expressed by the language now being considered. The burden of proof is, therefore, not upon the carrier, but upon the shipper; and there must be sufficient evidence of the carrier's negligence before the shipper can be allowed to recover. Much of the testimony is directed to this point, and I have given it careful attention, but without being able to take the libelants' view. No doubt the machinery, for some reason or reasons, did not do its work, and no doubt, also, its failure to reduce the temperature sufficiently was due to the several breakdowns, but I cannot discover sufficient evidence to satisfy my mind that the vessel was to blame for the accidents. Unless negligence is proved, the cause or causes of the accidents are not important; for the libelants' express contract relieved the carrier from liability for the consequences of any breakdown, "however caused."

The libel must be dismissed, with costs.