## THE CORNELIA.

(District Court, S. D. New York. September 1, 1926.)

1. Shipping ⬯142—Letter held both notice of claim and a claim of damages, within two clauses of bill of lading.

Within bill of lading requiring written notice of claim for damages to goods before their removal, if before such event there be opportunity to discover by examination that damage thereto exists or may exist, and in any event that written claim shall be made within 30 days after delivery of goods, letter of shipper of sugar to carrier, stating that, when steamer "began discharging this morning, it was noted that damaged sugars were being found," and "we are serving formal notice * * * that claim will be filed for this damage," held, in view of the purposes of the clauses to facilitate prompt investigation, to be both notice of claim and claim.

2. Shipping ⬯137—Exemptions in contract of carriage, by its terms subject to Harter Act, are so subject, irrespective of contract being shipping document within that act, and so do not extend to negligent failure to make vessel seaworthy (Comp. St. §§ 8029–8035).

By reason of contract of carriage providing that it is subject to all provisions of the Harter Act (Comp. St. §§ 8029–8035), exemptions in the contract and bill of lading, provisions of which are embodied in the contract, are subject to the provisions of such act, irrespective of the contract being a shipping document within that act, so that contract's exemptions cannot relieve ship or owners from liability for damages from negligent failure to make ship seaworthy.

3. Shipping ⬯132(4).

Shipowner has burden of proving exercise of due diligence to make vessel seaworthy, making available exemptions in contract of carriage from absolute warranty of seaworthiness.

4. Shipping ⬯132(5).

Under evidence, though sea water entered bridge deck space through forward bulkhead doors under continuous pounding of very heavy seas, held, doors were seaworthy.

5. Shipping ⬯132(5).

Under evidence, damage to cargo from sea water in bridge deck space held caused by scuppers not being in proper condition to carry off water, allowing it to rise above dunnage.

6. Shipping ⬯132(5)—Due diligence to make ship seaworthy as to drainage of certain cargo space held not shown by evidence.

Due diligence to make ship seaworthy with respect to drainage of certain cargo space held not shown, in view of clogged condition of scuppers at voyage end, and evidence of insufficient cleaning of space and defective testing of scuppers before voyage.

In Admiralty. Suit by the American Sugar Refining Company against the steamship Cornelia, the Bull-Insular Line, Inc., claimant, for damage to cargo of sugar. Decree for libelant.

Theodore L. Bailey, of New York City, for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Earl Appleman, both of New York City, of counsel), for respondent.

THACHER, District Judge. Pursuant to a contract between J. Ochoa Eno and the Bull-Insular Line for the transportation of 100,000 bags of sugar from ports in Porto Rico to New York during the period from December 8, 1921, to December 8, 1924, the claimant respondent undertook to carry on board the steamship Cornelia 10,000 bags of raw sugar from Porto Rican ports to Baltimore, Md., consigned to the shipper's order. During the course of this voyage unusually heavy weather was encountered, and the sugar was damaged by sea water which entered the bridge deck space through doors in the forward bulkhead of this space on the main deck, and through the cargo ports in No. 3 hold and No. 4 'tween deck space. Suit was brought by the libelant as the consignee and holder of the bills of lading under which the shipment was made.

The bills of lading contained the following:

"22. If there is opportunity to discover by examination, before removal of the goods, that loss of contents or shortage of or damage to the goods exists or may exist, the carrier shall not be liable for any such loss, shortage, or damage unless notice of claim therefor be presented in writing to the carrier, or to the master or agent of the vessel before removal of the goods. On packages tendered to, delivered to, or receipted for by consignee as being in the same order and condition as that specified on shipping receipt and/or B/L issued by the carrier at

point of shipment, the carrier will not be responsible for any loss of, damage to, or shortage in contents of such packages. The carrier or vessel shall not, in any event, be liable for any claim or demand arising hereunder or in respect to the goods, unless the claim be presented in writing to the carrier within 30 days after delivery of the goods to the carrier, nor unless suit therefor is commenced within 6 months after the delivery of the goods to the carrier, and the lapse of such period shall be deemed a complete bar to recovery in any such suit or proceeding not sooner commenced, notwithstanding the carrier may be a nonresident or a foreign corporation. Nothing shall be deemed a waiver of the provisions of this article except a written express waiver signed by the carrier."

On March 9, 1923, while the ship was discharging, the libelant wrote to the claimant the following letter:

"Bull Steamship Line, Stewart Building, Baltimore, Md. S/S Cornelia—Gentlemen: When this steamer began discharging this morning it was noted that damaged sugars were being found in the bunker hatch, and as notified you by 'phone, at the request of the underwriters, we are serving formal notice upon you that claim will be filed against the vessel for this damage. Please advise us as soon as you have finished your survey, in order that the damaged sugar may be discharged from the vessel, and used in the refinery in order to save any further loss.

"Yours truly,.

"The American Sugar Refining Company,
"Raw Sugar Department."

And thereafter, on April 17, 1923, wrote as follows:

"Bull Steamship Line, Baltimore, Md.—Gentlemen: S/S Cornelia—Arriving 3/8/23. Referring to our letter of March 9th., we are inclosing claim for damage to 576 bags of Porto Rico sugar landed ex this vessel, amounting to $3,229.87.

"Yours truly,
"The American Sugar Refining Company,
"Raw Sugar Department."

Inclosed in the last letter was an itemized statement of claim for damages to 576 bags of sugar.

[1] The requirement of the bills of lading that notice of claim be presented in writing before removal of the goods is in terms limited to those cases in which there is an opportunity to discover the loss or damage by examination before removal. With this requirement, the notice of claim under date of March 9th. was a compliance. But the claimant insists that the failure thereafter to present a claim in writing to the carrier within 30 days after delivery of the goods to the carrier is a bar to this suit. The two clauses, read together, should be construed as requiring notice of claim before removal, if the damage is discoverable, and, if not, presentation of claim within 30 days after delivery to the carrier. Two situations were in contemplation—one requiring notice before removal; the other, within 30 days. The language of the second clause, "The carrier or vessel shall not in any event be liable for any claim or demand * * * unless the claim be presented in writing to the carrier within 30 days," no doubt requires presentation of claim in every case within 30 days.

But unless a purely formal distinction between a claim and a notice of claim was intended, the letter which was written and delivered before removal of the cargo complies with both clauses, since it was in writing, called attention to the cargo which was damaged, and stated the intention of the libelant to make claim for loss. The purpose of such clauses is "not to escape liability, but to facilitate prompt investigation." The Persiana, 185 F. 396, 398, 107 C. C. A. 416; Georgia, Fla. & Ala. Ry. v. Blish Co., 241 U. S. 190, 36 S. Ct. 541, 60 L. Ed. 948. In view of the practical purpose intended, it would be quite unreasonable to construe the clauses in question as requiring documents in a particular form. The notice which was served before removal of the sugar afforded the intended opportunity to ascertain the extent of the damage and satisfied the purpose which the parties had in mind. The first letter should therefore be held to be a notice of claim within the meaning of the first clause, and a claim within the meaning of the second. Georgia, Fla. & Ala. Ry. Co. v. Blish Co., supra.

[2] The contract of carriage provides:

"*Exemptions from Liability.*—It is mutually agreed that this contract is subject to all of the terms and provisions of and all of the exemptions from liability contained in the act of Congress of the United States entitled 'An act relating to the navigation of vessels,' etc., approved on the 13th day of February, 1893, and the party of the second part shall be entitled to all of the exemptions from and limitation of liability provided for in sections 4281–4289 of the United States Revised Statutes and the statutes amendatory thereof and supplemental thereto, as if it were the actual owner of the vessel."

The contract of carriage further provides:

· *"Bills of Lading.*—Anything herein contained to the contrary notwithstanding, all shipments of cargo shall be under the steamship company's regular form of bill of lading, a copy of which is hereto annexed, which shall be issued therefor, and this contract and the steamship company's obligations in respect of any shipment shall be subject to and governed by the provisions of such bill of lading from the time the steamship company becomes responsible for the shipment, except that any special provisions of this contract regarding conditions of discharge, delivery, dispatch or demurrage or other charges or expenses, shall be controlling and may be inserted in the bill of lading."

The regular form of bill of lading, of which a copy was annexed to the contract of carriage, and under which the shipment was made, contains an exemption from liability for loss or damage occasioned by sea water, wetting, drainage, leakage, or wastage. The loss in this case was clearly within the language of this exemption, since the damage was done by water which entered the bridge deck space where a portion of the sugar was stowed. Respondent contends that the exemption applies, unaffected by the provisions of sections 1 and 2 of the Harter Act, because in so far as full cargoes are concerned the contract was one of private carriage, relying upon The G. R. Crowe (C. C. A.) 294 F. 506, and similar decisions.

But here the parties agreed that their contract should be governed by all the provisions and exemptions of that act. Necessarily exemptions contained in the contract and in the bills of lading, the provisions of which were embodied in the contract, are, as the parties agreed they should be, subject to the provisions of the Harter Act, not because the agreement of carriage is a shipping document within the meaning of that statute, but because the parties themselves agreed that the statute should apply to their contract of carriage. The contract of carriage thus being subject to the provisions of the Harter Act, its exemptions cannot relieve the vessel or her owners from liability for loss or damage arising from negligence in proper loading, stowage, custody or care of the cargo, or from failure to exercise due diligence to make the vessel seaworthy. Harter Act, §§ 1, 2 (27 Stat. 445 [Comp. St. §§ 8029–8035]).

[3] In the absence of special contract, an absolute warranty of seaworthiness is implied, regardless of the owner's diligence in providing a seaworthy vessel. The Southwark, 191 U. S. 1, 6, 24 S. Ct. 1, 48 L. Ed. 65; The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688. From this absolute warranty the vessel and her owners may be relieved by special contract, provided due diligence has been exercised to make the vessel seaworthy. The Prussia, 93 F. 837, 35 C. C. A. 625. The exemptions found in the contract of carriage and in the bills of lading are sufficient for this purpose, provided due diligence has been exercised to make the vessel seaworthy, but the claimant must sustain the burden of proving the exercise of due diligence. The Southwark, 191 U. S. at page 12, 24 S. Ct. 1, 48 L. Ed. 65, supra; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; Intern'l. Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830.

[4] Most of the damage occurred in the bridge deck space, and was caused by sea water which entered the bridge deck through the forward bulkhead doors, owing to the very heavy seas encountered on the voyage. While these doors were not of the very best construction, I am satisfied that they were reasonably fit for the purpose for which they were intended, and that according to modern standards of construction generally in use and well regarded their construction was seaworthy. It is claimed that the rubber gaskets with which they were fitted were so old as necessarily to have become unfit. This contention is based upon a statement of the chief officer that the gaskets had not been renewed for three years. In contradiction to this testimony the master testified that the gaskets had been regularly renewed every six months. The issue, I think, is determined by the testimony of the surveyor, who carefully examined the gaskets immediately upon the termination of the voyage, and who testifies quite positively that they were in good condition and did not require renewal. Upon this state of the record, I am constrained to find that the condition of these bulkhead doors was seaworthy, notwithstanding the fact that, owing to the very heavy seas encountered, which were shown to have continuously pounded upon the doors, sea water did enter the bridge deck space, owing to the unusual strains to which they were subjected under the pounding of the waves.

[5] It appears, however, that the scuppers

in the bridge deck space were so placed and were so clogged that the water which gradually entered during the course of the voyage through the bulkhead doors accumulated against a wooden bulkhead, which was constructed athwartships aft of the sugar which was damaged, but forward of two of the four scuppers in the bridge deck space. It is claimed that in this bulkhead semicircular holes were cut of about three inches in diameter to allow the passage of water under this bulkhead. Upon arrival of the ship, these holes were found to be plugged, and there was a large accumulation of water and molasses, which had dripped from the bags on the starboard side immediately forward of this bulkhead; the most serious damage having occurred in this area, quite apparently from the backing up of the water to such an extent as to overflow the dunnage and reach the lower tier of bags.

Since these bags, resting on the dunnage, were 3 or 4 inches off the floor, the claimant's theory that the flow of the water was prevented, not by improper drainage facilities, but by the molasses itself, seems untenable. There was little, if any, damage done where the water entered; the bags being placed a foot away from the forward bulkhead. From this fact it must be inferred that the water which entered the bridge deck space would not have come in contact with the sugar, had the scuppers been in proper condition to carry it off. Indeed, there could have been no contact with the water until enough had accumulated to rise above the dunnage upon which the sugar was placed, which it appears was 3 or 4 inches above the deck.

[6] The case therefore turns upon the question whether due diligence was used to make the ship seaworthy with respect to the drainage of this cargo space. It was the part of ordinary diligence to inspect the drains and scuppers and to properly clean the cargo space before commencing the voyage. The chief officer testified that the bridge deck space was cleaned and swept out well before stowing the sugar, and that the scuppers and drains were examined to see that the strainers were in place, and that the scuppers were tested with a long wire fall. He admits, however, that when this cargo space was opened at the termination of the voyage the scuppers were plugged up, and that there might have been splinters and dust as well as molasses in them.

Since the scuppers are intended to carry off water, the effective way to test their efficiency is with a hose. This was not done,

nor was the bridge deck space washed out before the voyage commenced. From the condition disclosed on the termination of the voyage, the conclusion cannot be avoided that the damage resulted either because the scuppers or the holes in the wooden bulkhead were choked before the voyage was commenced, or became choked during the voyage because of the presence of dirt and other foreign materials left in the cargo space before the cargo was placed therein. In either case it cannot be said that due diligence was exercised to make the ship seaworthy.

In Secretary of State v. Dreyfus & Co., 8 Lloyd's List Law Rep. 92, water which entered cargo space through perils of the sea accumulated because there was left in the holds a certain amount of débris which blocked the scuppers and prevented the water from getting away. It was there held that leaving this débris in the ship at the time of loading, instead of sweeping the deck clean, was to leave the ship in such a state that, if the water got into the hold, she would be in an unseaworthy condition, as the matter was not one that could be dealt with afterwards, and that therefore to load the vessel with this débris in her was to load her in an unseaworthy condition. It was concluded that, although the water got into the hold from perils of the sea, yet it was unseaworthiness on the part of the ship in confining the water and preventing it from getting away which did the greatest damage. If the drains were not choked by débris improperly left in the cargo space, from the fact that the water could not get away, it must be inferred that the scuppers were choked before the vessel sailed. Such condition would necessarily have been disclosed by proper tests.

In The Southwark, 191 U. S. 1, 15, 24 S. Ct. 1, 6 (48 L. Ed. 65), it was said: "The burden was upon the owner to show by making proper and reasonable tests that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried, and if by the failure to adopt such tests and to furnish such proofs the question of the ship's efficiency is left in doubt, that doubt must be resolved against the ship owner and in favor of the shipper." See, also, to the same effect, The Charlton Hall (D. C.) 285 F. 640; The Leerdam (D. C.) 8 F.(2d) 295, 1925 A. M. C. 1625.

The conclusion reached as to the cause of the damage renders irrelevant the contention of the parties upon the question as to whether or not the entry of the water

through the bridge deck doors was caused by a peril of the sea. Clearly the cargo was damaged, not by the entry of the water, but by its accumulation, resulting from improper drainage of the cargo space. Water also entered No. 3 hold through one of the cargo ports, and entered the 'tween deck through port No. 4, slightly damaging the cargo in each instance. This damage was apparently due to the insufficiency of these ports, and the burden of showing that due diligence was exercised before the commencement of the voyage to make them seaworthy has not, in my opinion, been sustained.

A decree in favor of the libelant is accordingly directed, with the usual provision for a reference to determine the amount of the loss.