## THE JOSEPH J. HOCK.

District Court, E. D. New York.
March 15, 1933.

On Reargument June 20, 1933.

On Further Reargument July 18, 1933.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, of counsel), for libelant.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for claimant.

INCH, District Judge.

General Chemical Company, libelant, brings this suit against the barge Joseph J. Hock and her owner, the Eastern Transportation Company.

The controversy arises over the transportation in the barge of approximately 1,500 tons of various chemicals belonging to libelant.

These chemicals consisted of tri-sodium phosphate, di-sodium, nitre cake, hypo-sulphite soda, and sodium fluoride, all of which is readily susceptible to damage by water and dampness.

On or about May 27, 1931, libelant, by charter party dated that day, hired this barge from respondent, for the purpose of carrying these chemicals from Marcus Hook, Pa., to South Providence, R. I. The chemicals were contained in bags, kegs, drums, and wooden barrels.

The loading of the barge at Marcus Hook was in charge of libelant. Libelant also was in charge of her unloading at South Providence.

No dunnage was used by libelant. First the drums were put in the aft part of the barge. These were one layer, and only ran

about one-third the way forward. Then barrels in three tiers fore and aft. Then on top of the barrels were placed bags. There were also some kegs, mostly placed at the ends of the barge. When this cargo was completed the hold of the barge was practically filled.

According to Warder, her master, the Hock was about 207 feet long, 34 beam, schooner built, about 2,240 tons capacity. When so loaded she had a freeboard, amidships, of about a foot and about 3 feet at bow and stern. She was an open barge without partitions in her hold. Her deck had five hatch openings with dead hatches between. These hatch openings were about 14x12 feet, while the space between or dead hatches were about 5 feet fore and aft. The hatch covers were in sections, and when down were covered by tarpaulins.

The charter agreement between the parties provided that the barge should be "tight, staunch, strong and every way fitted for such a voyage."

In other words, there was this express warranty of seaworthiness in addition to the usual implied warranty. The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241.

This agreement further provided that the cargo was "to be shipped on vessel's skin at shippers' risk" and that if dunnage was required "same was to be furnished by charterers at their expense."

Finally the agreement, among other things, provided that the charterers should designate where the barge would be loaded and discharged "always safely afloat."

I mention these particular provisions for the reason that they are all to be considered in a decision of the issues here.

I have no difficulty in finding that libelant was solely responsible for the manner in which this barge was loaded and discharged. That the merchandise when it went on board was in good condition, and that when it was discharged some of it was found damaged by water.

While there were some cracks in her deck around the hatch coamings, etc., these, I find, were not the proximate cause of what subsequently occurred.

When the barge was completely loaded she was taken in tow by a tug, and after several days voyage, and on or about July 1, she duly reached the dock of libelant at South Providence. She was then taken by one of libelant's tugs and placed alongside the dock where she was to be unloaded. Her master, Warder, said he inquired from "a crowd of men at the end of the pier how much water is there there" and they said, "How much water are you drawing," and "I said 14 or 15 feet." They said, "plenty for you," then "I said you can place the boat to suit yourselves wherever you want to."

Thereafter the unloading commenced by libelant's representatives. They started at the aft part of the barge. This necessarily lightened that end and caused the forward end to lower somewhat.

Apparently there was a longshoremen's strike in this neighborhood and I am convinced, from the testimony, that libelant was obliged to hire such men as it could. Certainly they did not have the usual negro stevedores. They were all white men with the negro head stevedore of libelant.

The unloading started about 11 o'clock on July 2, and about 3 o'clock Warder decided to use his pump and says he found it wouldn't work for the reason that, "my primer of the pump, it got full of mud." The result was, he says, that before he could get this pump working sufficient water had come up over the ceiling of the barge at the forward end sufficient to cover some of the ends of the barrels standing upon it and doing damage to the contents.

However the water got into this barge, I am convinced that ordinary dunnage, which apparently is from one to two inches thick, would not have availed in keeping the contents unaffected by this water.

At this time I am not concerned with the amount of damage, but only whether there was some damage for which respondent can be blamed.

The respondent was a private carrier, a bailee for hire. There is no doubt but that the libelant has satisfactorily shown, by credible testimony, that the cargo, when loaded upon the barge, was in undamaged condition, and that when such cargo was unloaded some of it was damaged by water. Whether such water damage was sea or fresh water does not appear except by inference. A witness testified that this could not be determined except by chemical analysis, and nothing of that kind is in evidence.

The libelant having made a prima facie case, the burden was on the bailee to show how the damage occurred, and that it was due to no lack of care on its part. Bushey & Sons v. W. E. Hedger & Co. (C. C. A.) 40 F. (2d) 417; Nelson v. Woodruff, 1 Black (66 U. S.) 156, 17 L. Ed. 97; Herman v. Com-

pagnie Generale Transatlantique (C. C. A.) 242 F. 859.

Respondent blames all the water either on this failure of the pump, which in turn is blamed upon a grounding, or on the rain that subsequently fell. I have carefully considered the story told by respondent's witness and am unable to agree with it in all respects. I am entirely concerned with whether or not respondent has borne the burden cast upon it.

It is apparent, and I so find, that the voyage from Pennsylvania to South Providence was in good weather and in all respects uneventful. There is no proof that there was any rain, or that the barge shipped any water.

We have, therefore, a situation where there is no doubt that a good cargo was damaged by water while in the hold of the barge. How did this water get in? Was it sea water or rain water? The explanation of respondent must satisfy the court that it was not due to unseaworthiness or negligence.

The barge left Pennsylvania on or about June 25th. She went out to sea at the Delaware breakwater and along the coast to Providence, arriving there July 1st. She was placed by libelant at the dock as we have seen, and unloading commenced at her stern. Then came the pump incident above referred to.

Warder, the barge master, has this to say on this point: "I discovered as soon as my primer pump got stuck I said to myself I have done it now. I have got my primer full of mud."

He thereupon says he complained about the lack of water and proceeded to see what he could do, but it was not for a considerable number of hours and until she had been pulled off somewhat from the dock in deeper water that he was able to get his pump working.

However, when his barge first went to this dock on July 1, he testified he had sounded and that he had found "7 inches of water at each end." Thus he was well aware of the situation when the after end of the barge was gradually lightened.

This, in my opinion, indicates carelessness on his part. The subsequent failure of his pump rendered the barge unseaworthy.

The unloading continued during July 2 and July 3. On the latter day Mr. Robert Gale, a cargo surveyor and appraiser, representing the insurance companies, and in this sense more interested in reducing the loss, went on board and found water damage.

Some of the barrels had water stain 6 to 8 inches from the bottom. If this was salt water from the failure of the pump, I do not see how this helps respondent. In my opinion, the proof reasonably shows that this damage so found was from an additional source.

Moon, a witness for respondent, master of the tugboat Rock which took the barge Hock, with two other barges, from the Delaware breakwater to New York, said, that as they came up the coast "the wind had increased easterly a bit, that created an easterly sea and then with the water came an easterly swell, which made the barges 'roll' from side to side." He denies that there was any heavy sea or water over the deck of the barges, and confirms that the weather was good. The Hock was a flat bottom barge which would not roll as much as a round bottom.

Vetra, another witness for respondent, who was master of the barge Hallowell, one of the barges accompanying the barge Hock on this trip, said: "The barges rolled a little, just the same as they would in any ordinary good weather coming along up and down the coast." During this voyage he sounded his barge, and, in answering to the question, "How frequently?" answered, "I will sound her every hour or every two hours. I can't let her go over two hours without sounding. You don't want to get too much water into her bilge. *If you get too much water in her when you get to a rolling sea, if there is any roll at all, a vessel, a wooden vessel especially, will blow her water up through her ceiling, that is why you have to be very particular."*

Walker, marine superintendent of respondent, testifies: "You can get a wooden boat almost tight but it is necessary to pump at intervals to keep the bilges clear. The depth of the bilge on the Hock is about 14 inches. For the water to rise to get over the ceiling it would have to be about 18 inches, 14 inches of timber and 4 inches of plank."

Brierley, marine surveyor, a witness for libelant, stated: "There is a certain amount of leakage found in most barges."

The master of the Hock, on direct, stated that before he arrived at the breakwater he sounded the Hock every four hours and found she was making no water. He was then asked: "Did you pump her during that time?" and he replied, "No sir." He also stated that on the trip from the breakwater the Hock "rolled some but it did not wash me." However, later in his examination he stated that as the voyage progressed *"of course I would catch the pumps now and then and suck them dry. I would never let any water be over 9*

*or 10 inches in the bilge.* I would pump to get the water down to 7 or 7½ inches," and finally he stated, "if they needed pumping I would pump right immediately. As *soon as I get to 8½ or 9 inches in pump.*"

Thus taking into consideration all the testimony, what was found by Gale on July 3, and the probabilities, it is reasonable to find that this rolling of the barge caused the barge "to blow her water up through the ceiling," and that this water was not kept down as it should have been by her master. A margin of such a few inches as he allowed might well be a few more sufficient to readily account for the water damage found on the barrels when she arrived. At any rate this is a failure of proof on the part of respondent.

Warder found on July 1, 15 inches aft in his bilge.

"Q. You found 23 inches of water forward in your sounding pipe? A. Yes sir.

"Q. If you had 20 inches of water in your ship let us say forward and aft you would have one inch of water over your ceiling? A. Over the ceiling, yes.

"Q. That is correct isn't it? A. Yes."

Warder saw Mr. Gale on board July 3; he saw him and "the boss" together down in the barge.

White, the head stevedore of libelant, 15 years' experience, with a gang of 8 men, worked on the barge July 2 and July 3, until it rained. Was on the boat from 8 to 10 times a day. He says: "The bottom tier of barrels had water stain at least three-quarter to half way up the barrel. Sugar barrels are about 3 feet high. There was about 6 inches difference in the height of the stain on the barrels stowed forward as compared with those stowed aft."

The other explanation of respondent for the water damage relates to the rainstorms that arose while the barge was unloading. The testimony of respondent's witnesses, which I find to be true, on this branch of the case is to the effect that while the barge was still being unloaded by the stevedores two rainstorms arose, the rain finally becoming so heavy, on each occasion, that the men left the boat. They did this without replacing any of the hatch covers or taking any further care for the cargo.

Warder, her master, protested against such conduct, and was forced to do the work himself with his helpers, of replacing the covers and covering same with the tarpaulins. He and his assistants each got very wet doing so. Thus it appears that libelant's gang

worked on the cargo July 2 and 3. They did not work the 4th day of July nor the 5th. On July 6 they started to work at 6 a. m., and they stopped at 11 a. m. Rain had started at 9:30 a. m. They worked in this rain about an hour and one-half. On July 8, they started to work about 6 a. m. It again started to rain at 10:30 a. m., and they stopped work at 11 a. m. This rain was not so hard as that of the former day.

So altogether, therefore, they worked in the rain about an hour and a half on July 6, and for half an hour on July 8.

During this time, with two or possibly three hatches left open to the rain, Warder appears to claim that substantially all the water found came into the boat.

While I cannot go so far as to find that this claim is well founded, I do find that some water damage was thus occasioned by libelant through no fault of respondent. That such damage can be readily separated from the other water damage is shown by the witness Gale, who has done this very thing. I do not mean by this that he is correct to the extent of foreclosing further proof before the commissioner, but only that there is plainly shown two causes for water damage. One for which respondent has failed to prove it is not liable; the other being the rain damage for which respondent is not liable.

If this opinion is not considered a sufficient compliance with the rule 46½ of the Admiralty Rules (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.

Decree for libelant, with costs and usual reference.

### On Reargument.

On March 15, 1933, this court rendered an opinion wherein it was decided that libelant was entitled to a decree.

Thereafter, and before any decree was signed, respondent moved for a reargument of the case.

On this motion respondent contends, I think correctly, that the court did not attach the importance to the clause in the charter, incorporating the Harter Act §§ 1–3 (46 USCA §§ 190–192), which should have been given it. The Cornelia (D. C.) 15 F.(2d) 245; Warner, etc., Co. v. Munson, etc., Line (D. C.) 23 F.(2d) 194.

There is no necessity for adding to or repeating the previous opinion, except to say that respondent is a private carrier. It chartered its entire barge to libelant, which in turn loaded the barge with certain of its mer-

chandise, to wit, chemicals, at a place in Pennsylvania, and had the barge towed to its plant in Rhode Island, where the libelant also unloaded it. When this merchandise was placed on board the barge it was in good order and condition. When it was unloaded at Providence some of it was found damaged by water.

Respondent's master was in charge of the barge throughout the voyage.

Libelant sought to recover for this damage from respondent on the ground that same was caused by neglect of respondent.

When the barge left Pennsylvania she was seaworthy. The Silvia, 171 U. S. 462; 19 S. Ct. 7, 43 L. Ed. 241; The Glenochil, Prob. Div. 10.

The stowage of the merchandise was solely in charge of libelant.

The barge was discharged at Providence solely by libelant. Some of the merchandise was then found damaged by water.

After the barge had been at her berth for several days and while she was being unloaded by libelant rainstorms arose. The proof therefore shows two distinct causes of damage. One, that caused before the rain and found shortly after discharging commenced; the other, that caused by the rainstorms.

No difficulty is presented in this connection, for the damage from these two causes can easily be and were distinguished in the testimony.

The court found that respondent was not liable, on the proof submitted, for the damage caused from rain, and sees no reason to change that decision.

The real controversy therefore is, What occasioned the water damage discovered after the barge arrived, and before the rain?

Libelant showed satisfactorily that it had deposited, in care of the barge, merchandise in good order, that, when this merchandise was discharged, some of it was found in bad order, due to water. In the case of common carriers the burden would then be shifted, requiring respondent to show how the damage occurred, and that such cause was not due to negligence. Bushey & Sons v. W. E. Hedger & Co. (C. C. A.) 40 F.(2d) 417, and cases cited in the first opinion of the court.

Respondent claims that there is a distinction between the law applicable to a public and private carrier [The Nordhvalen (D. C.) 6 F.(2d) 883 and similar cases], but, however that may be, sufficient was proved here requiring respondent to explain how this merchandise came to be wet.

Respondent blames the presence of any water damage entirely on the rainstorms. Libelant, however, sufficiently showed by the witness Gale, a marine surveyor representing insurance interests, that he had inspected the cargo on July 3, which was prior to any rainstorms. He was asked as follows by proctor for libelant:

"Q. Did you examine the cargo on board the vessel? A. Yes, sir.

"Q. Did you subsequently examine it after it was discharged at the dock? A. Yes, sir.

"Q. What was the condition of the cargo? A. It was wet, stained and caked."

On cross-examination he was asked:

"Q. Could you walk through the entire hold on July 3rd? A. Yes, sir.

"Q. See the bottom all through? A. Between the stowage, yes.

"Q. And you could see stains upon the barrels down at the bottom? A. Yes, sir.

"Q. All over the boat? A. Yes, sir.

"Q. For the length of the boat? A. Yes, sir.

"Q. And you could see stains on the barrels throughout the entire boat at different places? A. Yes, sir."

On redirect he was asked:

"Q. You did, did I understand, go the whole length of the barge in the hold? A. Yes, sir.

"Q. How far was it from where you were on top of the cargo down to the bottom of the hold? A. Well, that would vary because in some sections there was only one tier and others there might be two and possibly three.

"Q. How high were these barrels? A. Oh I should say about 3 feet or a little more.

"Q. Was there any difficulty whatever in seeing between the barrels down to the bottom of the ship? A. No, sir.

"Q. How far up on the barrels did you notice the stains to which you have referred? A. 6 to 8 inches.

"Q. What was the discoloration? A. As I remember it, it was a dark muddy color stain.

"Q. When was it that you first noticed damage on the tops of the barrels? A. I think on July 8th."

This testimony, in the opinion of the court, proved that there had been water damage to the cargo while in the barge and prior to the rain.

At the trial the respondent, in addition to claiming that this testimony was unreliable

and that the rain had caused all the damage, proved that when the barge arrived at Providence the unloading commenced at her stern, which, in turn, caused her bow to descend somewhat, and that this descent of the bow caused the primer of the barge pump to go into the mud and caused the pump to be temporarily inoperative.

There is no doubt that the barge had to be withdrawn from her berth, this primer cleaned out, and the barge brought back, when discharging continued. There is testimony, from which a fair inference arises, that in the meanwhile water of the bilge had accumulated over the ceiling of the barge.

For the purpose of this reargument therefore we have the following facts:

The unloading of the barge at Providence was entirely in charge of the libelant. Libelant commenced discharging at the stern and caused the bow to descend into the mud. When some of the cargo was unloaded it was found to have been damaged by water while in the barge. The subsequent rainstorms did not occasion this damage. How then did this water enter the barge to do the damage found?

There is no proof that the barge leaked. In fact the contrary is shown. When I use the word "leak" I do not refer to the ordinary accumulation of bilge water found in barges and kept in check by proper use of a pump. The only proven source of the entry of water over the ceiling of the barge, therefore, was this bilge water.

The court suggested a possible opportunity for this bilge water to so arise on the voyage.

The first cause was that proved by respondent, to wit, the tipping of the bow of the barge, due to the commencement of unloading at her stern, with the subsequent clogging of the primer of the pump and the inability of the master to pump until considerably later. The second, as suggested by the court, was the natural rolling of the barge on the voyage to Providence. This cause both libelant and respondent claim is not supported by the evidence, as the voyage was found by the court to be uneventful, without storm, or any proof that water came on the decks of the barge, and, in fact, was possibly a speculation by the court in its search for a second cause.

However, even if the failure of the master of the barge to pump during the voyage was found, this failure, on the evidence in this record, would have been a part of the management of the ship. The Silvia, supra; The Glenochil, supra; The British King (D. C.) 89 F. 872; Sun Co. v. Healy (C. C. A.) 163 F. 48.

■ Returning therefore to the cause proved by respondent and which it is probable, in view of all the circumstances, did create the situation later found by Gale, the important question raised by respondent, on this argument, appears. Was the failure of the master to pump, due to his carelessness in allowing the primer to become clogged, a part of the management of the barge?

I have already found that the barge was seaworthy, and the record sufficiently shows also that proper steps had been taken by respondent to make her reasonably so. Harter Act § 3 (46 USCA § 192).

On the other hand libelant asserts that the former decision of the court was correct, and relies to a great extent upon The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610.

In The Germanic, supra, it was found that "the loss was due to hurried and imprudent unloading" (page 595 of 196 U. S., 25 S. Ct. 317, 318), and also "that, after the Germanic was made fast, she was given in charge of the shore agents of the owners, and that they alone assumed direction of the discharging and loading of cargo, and prepared her for the return voyage." (Page 596 of 196 U. S., 25 S. Ct. 317, 318).

In other words, in The Germanic Case the proximate cause for the damage was the hurry by those unloading the cargo, and this primary purpose or cause brought into effect all the incidental acts.

In the case before me this unloading of the barge was solely in charge of libelant.

The decision to first take the cargo from the stern of the barge was also that of libelant and not of respondent; a method in no way shown to be unusual or extraordinary so as to reasonably call for a protest from the master.

I do not see therefore how respondent can be blamed on such facts where libelant had agreed, in the charter, to always keep the barge "safely afloat."

It seems to me, as I have carefully examined the authorities cited, and others that could be cited, that the answer to the question of "primary purpose" or "proximate cause," found by the court, places that cause within or without the protection of the statute.

Thus it has been said: "If the primary purpose is to affect the ballast of the ship, the

change is management of the vessel; but if, * * * the primary purpose is to get the cargo ashore, the fact that it also affects the trim of the vessel does not make it the less a fault * * * which the first section removes from the operation of the third. * * * The question which section is to govern must be determined by the primary nature and object of the acts which cause the loss." The Germanic, supra, 196 U. S. page 598, 25 S. Ct. 317, 318, 49 L. Ed. 610.

Again, in Botany Worsted Mills v. Knott (D. C.) 76 F. 582, where a cargo of wool was damaged by contact with wet sugar, the contact being brought about by allowing the ship to be "down by the head," this change of trim was found merely incidental, and was not done primarily for the benefit of the ship, which would have made it a part of her management, but was negligence in caring for the cargo of wool. This case was affirmed. Knott v. Botany Worsted Mills, 179 U. S. 69, 21 S. Ct. 30, 45 L. Ed. 90.

On the other hand, in The Indrani, 177 F. 914 (Circuit Court of Appeals, Second Circuit), the allowing a ship to be down by the head while discharging cargo, and having nothing to do with such discharge, but solely for the purpose of examining her propeller, was found to be a part of the management of the vessel.

If, therefore, this water came into the barge so as to damage the cargo at Providence due to the bow being "tipped," by reason of this unloading at the stern causing the barge to be "down by the head," as the direct result of the "primary purpose of those unloading the barge, this was a matter entirely within the control of libelant and done solely at its direction."

If, however, the water would not even then have arisen over the ceiling of the barge unless the master had been careless in failing to pump, the proximate cause for the entry of the water would then have been this neglect on the part of the master to operate his pump.

The operation of this pump had no connection with the discharge of the cargo. Sun Co. v. Healy, 163 F. 48 (Circuit Court of Appeals, Second Circuit).

While the burden rests upon the respondent to prove that an act of negligence found by the court falls within the exempting statute, Andean Trading Co. v. Pacific, etc., Co. (C. C. A.) 263 F. 559, it seems to me, in this case, that respondent has duly borne that burden.

Therefore, although libelant has made a prima facie case calling for an explanation, respondent has met this requirement by showing that the cause of the entry of the water doing the damage was this negligence of the master in allowing his pump to get out of order and his subsequent inability to work it, and that such negligence is excused by the statute. If I am correct, my first decision was wrong.

After careful consideration, upon this reargument I am convinced that the negligence found by me as a basis for the decision in favor of libelant does not impose liability on this respondent, and for that reason respondent is entitled to a decree dismissing the libel, and my previous decision is set aside.

### On Further Reargument.

After filing of the decision, on reargument, June 20, 1933, at the request of counsel for libelant, the court allowed a still further reargument. It is not convinced that its decision is wrong. The principal point with which the court is now concerned is the claim that there was testimony in the record inconsistent with the following statements by the court in its decision. "The unloading of the barge at Providence was entirely in charge of the libelant. Libelant commenced discharging at the stern and caused the bow to descend into the mud." Page 6 [4 F. Supp. 633] of opinion. "The decision to first take the cargo from the stern of the barge was also that of libelant and not of respondent, a method in no way shown to be unusual or extraordinary so as to reasonably call for a protest from the master." Page 9 [4 F. Supp. 633] of opinion.

The inconsistency claimed is, in substance, as follows: That while libelant's stevedore commenced unloading the barge at the stern, the master testified that the discharging of the ship was always under his direction; that he had directed that the discharging start in No. 5 hatch; that later he directed them to quit working No. 5, and the work started on No. 4.

From this testimony, libelant argues that the unloading at the stern of the barge was solely due to the master of the barge, and that therefore libelant is not to be charged with starting the work at that place.

I have carefully re-examined the record, and I can find no evidence that justifies me in holding that the master told any particular person in charge of the work where to start.

White, libelant's witness, who was in charge of the stevedores for libelant, testi-

'fied that he never had any conversation with the master except when the latter complained that his pump was out of order. This ac-·cording to the master was later in the afternoon, about 3 o'clock. The discharge had started at 11:30 that morning. It was in the afternoon then, after the master found his pump would not work, that he directed that the discharge start on hatch No. 4 rather than on No. 5.

The boss stevedore of libelant was a man of some 15 years' experience. It seems to me that the confusion arises not from any specific direction by the master to this boss stevedore and his gang, at the commencement of the work, but rather from the experi-enced stevedore commencing work at the stern of the barge, with the consent and approval of the master, and that any interference with this work did not occur until later in the day, when the master discovered that his pump was not working.

To be sure the master of the barge was in general charge of the boat, and it is his duty to see that she is not exposed to any undue strain. In my opinion this is all that he means when he testified that the discharging of the barge was always under his direction and that the work started in No. 5 under his authority.

I do not credit his testimony if what he intended is that he specifically talked with the boss stevedore earlier in the day. This is also denied by White.

It therefore comes down to this: That the work done by the master of the barge was simply a part of the management; that libelant commenced work at the stern of the barge for the purpose of unloading; that this work was not interfered with by the master until later in the afternoon when he discovered his pump would not work; that this master, aside from such acts of management, was not concerned with the unloading of the barge, and such acts of management were en-tirely distinct from the loading, stowage, and discharge of the cargo.